**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| DIAA AL AMAD, derivatively on behalf of FLUENCE ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> JULIAN NEBREDA, AHMED PASHA, CYNTHIA ARNOLD, HERMAN BULLS, EMMA FALCK, RICARDO FALU, ELIZABETH FESSENDEN, HARALD VON HEYNITZ, BARBARA HUMPTON, AXEL MEIER, TISH MENDOZA, CHRIS SHELTON, and SIMON JAMES SMITH, <br><br> Defendants, <br><br> and <br><br> FLUENCE ENERGY, INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-577 <br><br><br> DEMAND FOR JURY TRIAL |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Diaa Al Amad ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Fluence Energy, Inc. ("Fluence" or the "Company"), files this Verified Shareholder Derivative Complaint against Julian Nebreda ("Nebreda"), Ahmed Pasha ("Pasha"), Cynthia Arnold ("Arnold"), Herman Bulls ("Bulls"), Emma Falck ("Falck"), Ricardo Falu ("Falu"), Elizabeth Fessenden ("Fessenden"), Harald von Heynitz ("von Heynitz"), Barbara Humpton ("Humpton"), Axel Meier ("Meier"), Tish Mendoza ("Mendoza"), Chris Shelton ("Shelton"), and Simon James Smith ("Smith") (collectively, the "Individual Defendants" and together with Fluence, the "Defendants") for breaches of their fiduciary duties as directors and/or

officers of Fluence, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Nebreda and Pasha for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fluence, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fluence's current and/or former officers and directors from November 29, 2023 to February 10, 2025, both dates inclusive (the "Relevant Period").

2.      Fluence, through its subsidiaries, purports to be "a global market leader delivering intelligent energy storage and optimization software for renewables and storage." [1] The Company's products and services include energy storage products and solutions, digital applications, delivery services, recurring operational and maintenance services, and services for other power assets. The Company also maintains relationships with third-party manufacturers for the production and integration of its proprietary battery energy storage systems ("Cubes").

---

[1] Fluence Energy Inc., Annual Report (Form 10-K) (Nov. 29, 2024),
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001868941/000186894124000070/flnc-20240930.htm.

3.      The Company was formed in 2021, and it conducts its business operations through Fluence Energy, LLC and both its direct and indirect subsidiaries. Fluence Energy, LLC, was created as a joint venture between indirect subsidiaries of Siemens AG ("Siemens") and The AES Corporation ("AES"), Siemens Industry Inc. ("Siemens Industry") and AES Grid Stability, LLC, ("AES Grid Stability") respectively.

4.      Per the Company's annual report for the fiscal year 2024, AES Grid Stability's holdings in Fluence amounted to approximately 66.6% of the Company's voting power. Siemens Industry's holdings amounted to 13.3% of the Company's voting power. Notably, slightly over forty percent of the Company's revenue derived from related parties, and the primary related party for the purposes of revenue was AES Grid Stability.

5.      The Relevant Period began on November 29, 2023 when Fluence hosted an earnings call with analysts and investors concerning its reported financial results for the fiscal 2023 fourth quarter and filed its annual report on Form 10-K with the SEC. During the earnings call, Defendant Nebreda touted Fluence's ". . . robust financial performance . . ." and that the Company had ". . . proactively secure[d] [its] future by solidifying [its] batter supply for fiscal year'24 and '25, thus ensuring [its] ability to meet [its] growing demand." Defendant Nebreda reinforced these statements by stating the Company ". . . grew iron ore revenue by 85% and achieved [its] first profitable quarter [,] . . . [which] secured all [the Company's] battery needs for '24 and '25."

6.      Throughout the Relevant Period, the Company and its top executives made false and/or misleading statements regarding the Company's business and operations. Specifically, during the Relevant Period, the Company failed to disclose a counterclaim by a founder and major customer, Siemens Energy, concerning disputes over the Company's battery energy storage system project. Similarly, the Company failed to disclose that another founder and major customer, AES

Grid Stability, sought to divest its shares in the Company.

7.    The truth began to emerge on February 22, 2024, when Blue Orca Capital reported that Siemens Energy, Siemens's U.S. affiliate, had filed a counterclaim in November 2023 against the Company for, *inter alia*, fraud and breach of contract, and that both Siemens and AES were divesting their interest in the Company. Blue Orca's report also alleged that the Company's sales and earnings growth figures were unreliable as the growth derived from "selectively applied earnings adjustments" and "aggressive revenue pull-forwards."

8.    On this news, the price of the Company's stock fell $2.28 per share, or approximately 13%, from a closing price of $17.01 per share on February 21, 2024, to close at $14.73 per share on February 22, 2024.

9.    Nevertheless, Defendants Nebreda and Pasha maintained a positive outlook for the Company. In a press release the Company published the same day in response to the report, they represented, *inter alia*, that the Blue Orca Capital report "wrongly implies AES is moving away from Fluence as a supplier"; that "Fluence continues to be AES' preferred Battery Energy Storage Systems technology provider"; that Fluence's "robust pipeline of sales to other customers continues to grow"; and that the Company "believe[d] the litigation with Siemens Energy has no effect on our strong relationship with Siemens AG."

10.    Later, during an earnings call concerning reported financial results for the fiscal 2024 second quarter on May 9, 2024, Defendants Nebreda and Pasha stated their confidence in Fluence's ability to reach its revenue targets. Following this, Fluence hosted an earnings call concerning reported financial results for the fiscal 2024 third quarter on August 8, 2024. Again, Defendants Nebreda and Pasha espoused the "strong" growth prospects for Fluence in the coming fiscal year. Notably, Defendant Pasha criticized the Blue Orca report, stating that its allegations

were ". . . without merit." Later, on November 26, 2024, Defendant Nebreda continued to convey confidence in the Company during an earnings call for the fiscal 2024 year that the Company hosted the same day.

11.    The truth fully emerged on February 10, 2025 when the Company published a press release concerning Fluence's financial results for the first quarter of its fiscal year 2025. The Company's press release reported a net loss of $57 million, or $0.32 per share, compared to the previous year's loss of $25.6 million or $0.14 per share, for the same period. In addition, Fluence reported that revenues had fallen 49% year-over-year to $186.8 million. The Company also revised its revenue guidance for 2025, lowering the range from $3.6 billion to $4.4 billion to $3.1 billion to $3.7 billion, with Defendant Nebreda stating: "[w]e have experienced customer-driven delays in signing certain contracts that, coupled with competitive pressures, result in the need to lower our fiscal year 2025 outlook."

12.    On this news, the price of the Company's stock fell $6.07 per share, or approximately 46.44 %, from a close of $13.07 per share on February 10, 2025, to close at $7.00 per share on February 11, 2025.

13.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their

holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

15.    The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

16.    In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Senior Vice President and Chief Financial Officer ("CFO") to a securities class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Nebreda's and Pasha's liability in the Securities Class Action,

and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1) , Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.      Plaintiff is a current shareholder of Fluence. Plaintiff has continuously held Fluence common stock at all relevant times.

### Nominal Defendant Fluence

23.      Fluence is a Delaware corporation with principal executive offices at 4601 Fairfax

Drive, Suite 600, Arlington, Virginia 22203. Fluence's common stock trades on The Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "FLNC."

**Defendant Nebreda**

24.     Defendant Nebreda has served as the Company's President and CEO since September 1, 2022 and as a Company director since September 2021. Defendant Nebreda also serves as a member of the Finance and Investment Committee.

25.     The Schedule 14A the Company filed with the SEC on January 24, 2025 (the "2025 Proxy Statement") stated the following about Defendant Nebreda:

**Professional Experience:**

Mr. Nebreda has served as President and Chief Executive Officer of Fluence since September 1, 2022 and as a member of our Board since September 2021. Prior to joining Fluence as President and Chief Executive Officer, Mr. Nebreda served as Executive Vice President and President of US & Global Business Lines for AES from January 2022 through August 2022. In this role, Mr. Nebreda was responsible for AES' renewables' growth in the US through its clean energy business, which included development and implementation of robust supply chain strategies. He previously served as President of AES' South America Strategic Business Unit (SBU) from October 2018 to January 2022. From April 2016 to October 2018, Mr. Nebreda served as President of AES' Brazil SBU and President of the AES Europe SBU from 2009 to April 2016. Prior to that, Mr. Nebreda held several senior positions with AES beginning in 2005.

Mr. Nebreda also previously served as Chairman of the Board of AES Andes S.A. and AES Brasil Energia, S.A. He also previously served on the board of directors for IPALCO Enterprises, Inc. from February 2018 to April 2019 and on the board of directors for The Dayton Power & Light Company from March 2018 through May 2019.

**Key Attributes, Skills, and Qualifications:**

Mr. Nebreda earned a law degree from Universidad Católica Andrés Bello in Caracas, Venezuela. He also earned a Master of Laws in common law with a Fulbright fellowship and a Master of Laws in Securities and Financial Regulations, both from Georgetown University.

We believe Mr. Nebreda is qualified to serve on our Board due to his years of senior leadership experience in the energy sector, his experience in driving transformational change, and extensive knowledge and background in renewables

growth. In addition, as the only management representative on our Board, Mr. Nebreda provides a unique perspective in Board discussions about the business and strategic direction of the Company.

**Defendant Pasha**

26.    Defendant Pasha has served as the Company's Senior Vice President and CFO since January 2024.

27.    The 2025 Proxy Statement stated the following about Defendant Pasha:

*Ahmed Pasha* has served as the Company's Senior Vice President and Chief Financial Officer since January 1, 2024. Mr. Pasha was previously with AES in a variety of roles for over 25 years. Most recently, he served as the Chief Financial Officer, US Utilities and Conventional Generation from January 2022 through December 2023. Prior to that role, he served as Corporate Treasurer from January 2020 through December 2021 and as Vice President, Investor Relations from January 2012 through December 2021 with AES. Ms. [sic] Pasha also previously served as a director of DPL Inc. from July 2023 through January 1, 2024, as a director of AES Ohio from October 2022 through January 1, 2024 and as a director of IPALCO Enterprises, Inc. from October 2022 through January 1, 2024. Mr. Pasha has his bachelor's degree in business/commerce from the University of Punjab.

**Defendant Arnold**

28.    Defendant Arnold has served as a Company director since October 2021. Defendant Arnold also serves as a member of the Nominating and Corporate Governance Committee and the Audit Committee and as the Chairperson of the Compensation and Human Resources Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Arnold:

**Professional Experience:**

Dr. Arnold has served as a member of our Board since October 2021. She previously served as the Chief Technology Officer for Valspar Corporation from 2011 to 2017, leading its global technology activities. Dr. Arnold was previously with Sun Chemical Corporation where she served as Chief Technology Officer from 2004 to 2011. Prior to Sun Chemical, she served as Vice President, Technology, Coatings Adhesives and Specialties, for Eastman Chemical Company from 2003 to 2004 and in R&D and business leadership positions with General Electric from 1994 to 2003. Dr. Arnold was a Sloan Executive Science and Engineering Fellow in the White House Office of Science and Technology Policy

from 1992 to 1994.

She has served on the board of Cabot Corporation (NYSE: CBT) since January 2018. She also currently sits on the boards of Milliken & Company and Citrine Informatics. Dr. Arnold previously sat on the Supervisory Board of Avantium NL, a Dutch technology company in renewable chemistry, from September 2020 to May 2022 and served on the Materials Advisory Board as well as a consultant for Carbon 3D from November 2017 through May 2023.

**Key Attributes, Skills, and Qualifications:**

Dr. Arnold holds a Doctorate in Materials Science and Engineering from Virginia Polytechnic Institute and State University, and a Master of Business Administration and Management and a Bachelor of Science degree in Chemical Engineering from the University of California, Berkeley.

We believe Dr. Arnold is qualified to serve on our Board of Directors due to her leadership experience and her expertise and dedication to renewable energy, sustainability, innovation, and growth strategies for new technologies.

**<u>Defendant Bulls</u>**

30.     Defendant Bulls has served as Chairperson of the Board since October 2021. He also serves as the Chairperson of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Finance and Investment Committee.

31.     The 2025 Proxy Statement stated the following about Defendant Bulls:

**Professional Experience:**

Mr. Bulls has served as the Chairperson of our Board since October 2021. He has spent over thirty years at Jones Lang LaSalle (JLL), currently serving as Vice Chairman, Americas, and International Director and founder of JLL's Public Institutions business unit, which specializes in delivering comprehensive real estate solutions to nonprofit organizations, higher education institutions, and governments at the federal, state, and local levels. A thought leader and strategic advisor, Mr. Bulls guides the firm and senior executive clients on issues related to real estate occupancy, the environment, corporate governance, and social trends. Additionally, Mr. Bulls previously co-founded and served as President and Chief Executive Officer of Bulls Capital Partners, a multi-family financing company, and founded Bulls Advisory Group, LLC, a management and real estate advisory firm. Prior to joining JLL, Mr. Bulls completed nearly twelve years of active-duty service with the United States Army. He retired as a Colonel in the U.S. Army Reserves in 2008 and received the Legion of Merit award for his leadership and strategic thinking

skills. In November 2021, Mr. Bulls was appointed by the United States Department of Defense to the Defense Policy Board, which provides the Secretary of Defense and the Deputy Secretary of Defense advice and opinions concerning matters of defense policy.

Mr. Bulls has served on the board of directors for Host Hotels and Resorts, Inc. (NASDAQ: HST) since June 2021, USAA since 2010, Comfort Systems USA, Inc. (NYSE: FIX) since 2001, Collegis Education since September 2020, American Red Cross since September 2016, New York State Teachers' Retirement System since May 2000, and the West Point Association of Graduates since 1996. He previously served on the board of American Campus Communities, Inc. (formerly listed on the NYSE prior to acquisition by The Blackstone Group) from January 2021 through August 2022.

**Key Attributes, Skills, and Qualifications:**

Mr. Bulls holds a Master of Business Administration from Harvard Business School and a Bachelor's degree in Engineering and Economics from the United States Military Academy at West Point.

We believe Mr. Bulls is qualified to serve on our Board of Directors due to his extensive experience as a thought leader, particular knowledge of team-building and strategic development, financial expertise, and dedication to governance and sustainability.

### **<u>Defendant Falck</u>**

32.    Defendant Falck served as a Company director from September 2021 until March 2025.

33.    The Schedule 14A the Company filed with the SEC on January 26, 2024 (the "2024 Proxy Statement") stated the following about Defendant Falck:

**Emma Falck** has served as a member of our Board since September 2021. Ms. Falck has served as the Senior Vice President and Head of Business Segment Connected Devices at Siemens since April 2023. Ms. Falck previously served as Head of Strategy of Smart Infrastructure at Siemens from September 2020 through March 2023. She also served as a Managing Director and Partner at the Boston Consulting Group from May 2017 to August 2020 and Vice President, Greater China Area New Equipment, and China Frontline Product Strategy and Marketing for the KONE Corporation from 2015 to April 2017. At KONE, Ms. Falck also served as Director, Greater China Area New Equipment, and China Frontline Product Strategy and Marketing from 2014 to 2015 and Director of Strategy Development from 2012 to 2014. She holds a Master of Science degree in

Engineering Physics and a Doctor of Science degree in Computational Physics from Aalto University.

Ms. Falck is qualified to serve on our Board of Directors due to her extensive experience in leading operations globally at both Siemens and KONE, and her expertise and dedication to smart infrastructure, the energy industry, emerging markets, and product strategy.

**Defendant Falu**

34.     Defendant Falu has served as a Company director since September 2022. He also serves as a member of the Finance and Investment Committee. In addition, Defendant Falu has served as Executive Vice President, Chief Operating Officer and President, New Energy Technologies SBU at AES since February 2024 and previously was Senior Vice President, Chief Operating Officer and President of New Energy Technologies at AES from July 2023 to February 2024.

35.     The 2025 Proxy Statement stated the following about Defendant Falu:

**Professional Experience:**

Mr. Falu has served as a member of our Board since September 2022. He has served as Executive Vice President, Chief Operating Officer and President, New Energy Technologies SBU at The AES Corporation ("AES") since February 2024 and previously was Senior Vice President, Chief Operating Officer and President of New Energy Technologies at AES from July 2023 to February 2024. He's served in a number of other roles with AES, including as Senior Vice President and Chief Strategy and Commercial Officer from August 2022 through July 2023, SBU President of AES Andes S.A. from January 2022 through August 2022, Chief Executive Officer of AES Andes S.A. from April 2018 through August 2022 and Chief Financial Officer of AES Andes S.A. from November 2014 through April 2018. Mr. Falu joined AES in 2003, and since that time, he also served as Chief Financial Officer for AES businesses in the Andes and in Mexico, Central America, and the Caribbean regions.

He currently sits on the board of AES Andes S.A., a public company in Chile, and on the board of AES Colombia. In addition, Mr. Falu has served on the board of directors of IPALCO Enterprises, Inc. and DPL Inc. since August 2023.

**Key Attributes, Skills, and Qualifications:**

Mr. Falu is a National Public Accountant as certified by the Universidad Nacional de Salta in Argentina and graduated summa cum laude with an Executive MBA from IAE Business School. He continued his education through executive financial, business, and administration programs at Darden Business School, The Wharton School, and Harvard Business School.

We believe Mr. Falu is qualified to serve on our Board due to his substantial executive experience in leading long term strategy on energy transitions in his various roles at AES and a broad knowledge of corporate finance, strategic planning, operations, and investor relations; he also has knowledge of and experience with complex financial and accounting functions and internal controls.

**Defendant Fessenden**

36.    Defendant Fessenden has served as a Company director since October 2021. She also serves as a member of the Audit Committee and the Compensation and Human Resources Committee.

37.    The 2025 Proxy Statement stated the following about Defendant Fessenden:

**Professional Experience:**

Ms. Fessenden has served as a member of our Board since October 2021. Ms. Fessenden is a strategic leader with demonstrated success in profit and loss management from over twenty-five years as a senior executive with Fortune 100 global industrial manufacturing company, Alcoa Inc., and private equity firm American Capital. At American Capital, Ms. Fessenden served as Principal, Operations Team from 2005 to 2007. At Alcoa Inc., Ms. Fessenden served as President, Flexible Packaging, from 2002 to 2005, President, Primary Metals Allied Businesses from 2000 to 2002, Director, Executive Staffing and Leadership Development from 1998 to 2000, and Smelting Plant Manager from 1994 to 1998. Ms. Fessenden also founded Fessenden Associates, LLC, a business consulting company, in 2008.

She has served as a member of the board of directors at Ampco-Pittsburgh Corporation (NYSE: AP) since August 2017, and Plan International USA since November 2017. She previously served on the board of directors of Alpha Metallugical Resources Inc. (NYSE: AMR) from February 2021 through February 2024 and Meritor, Inc. (formerly listed on NYSE prior to acquisition by Cummins Inc.) from June 2021 through August 2022.

**Key Attributes, Skills, and Qualifications:**

Ms. Fessenden holds a Master of Business Administration, Master's degree in Systems Engineering, and Bachelor's degree in Electrical Engineering from Clarkson University.

Ms. Fessenden has extensive experience as a board director and leader for public and private companies including experience as chair of Compensation, Governance, Audit, and CEO Search committees.

We believe Ms. Fessenden is qualified to serve on our Board due to her leadership and public board experience, her financial and operations acumen, and her commitment to clean energy technology.

**Defendant von Heynitz**

38.     Defendant von Heynitz has served as a Company director since October 2021. He also serves as Chairperson of the Audit Committee and as a member of the Compensation and Human Resources Committee and the Nominating and Corporate Governance Committee.

39.     The 2025 Proxy Statement stated the following about Defendant von Heynitz:

**Professional Experience:**

Mr. von Heynitz has served as a member of our Board since October 2021. Mr. von Heynitz is a senior accountant and auditor certified in Germany and the United States with extensive experience in accounting, auditing, financial, and business advisory. He has been registered in his own practice since January 2020. Mr. von Heynitz has been a Managing Director of WTS Advisory GmbH (formerly known as WTS Advisory Steuerberatungsgesellschaft mbH) since February 2020. Mr. von Heynitz worked for KPMG International Limited ("KPMG") in Munich and New York for thirty-three years beginning in January 1987 and ending in December 2019. He became a partner in 1999 and served as Audit Lead Partner and/or Global Client Lead Partner at large publicly listed companies. During the last fifteen years of his time with KPMG, he held different leadership positions within KPMG, including serving as the Partner in charge of the Audit function for Southern Germany from 2004 to 2007 and member of the KPMG Europe LLP Board from 2007 until 2012.

Mr. von Heynitz has served as a member of the supervisory board of Cherry SE (FWB: C3RY), a global manufacturer of computer input devices, since April 2024 and previously served as an independent director for Siemens Gamesa Renewable Energy SA from February 2020 through February 2023, which was delisted from

14

the Spanish stock exchanges following acquisition by Siemens Energy in February 2023.

**Key Attributes, Skills, and Qualifications:**

Mr. von Heynitz graduated with a degree in Business Administration from the University of Munich and has been certified as a tax consultant and certified public accountant in Germany for more than twenty-five years. He has been a member of the AICPA since 1997. In April 2024, he completed training and passed an exam managed by Deutsche Boerse AG (German stock exchange) to become "Qualifizierter Aufsichtsrat" (Qualified member of a Supervisory Board).

We believe Mr. von Heynitz is qualified to serve on our Board of Directors due to his leadership experience and financial expertise.

### Defendant Humpton

40.     Defendant Humpton has served as a Company director since September 2021. She also serves as a member of the Compensation and Human Resources Committee. In addition, she has served as President and Chief Executive Officer of Siemens Corporation, the largest subsidiary of Siemens AG, since June 2018.

41.     The 2025 Proxy Statement stated the following about Defendant Humpton:

**Professional Experience:**

Ms. Humpton has served as a member of our Board since September 2021. She has served as President and Chief Executive Officer of Siemens Corporation, the largest subsidiary of Siemens AG, since June 2018, where she leads strategy, operations, and services in the United States in the areas of electrification, automation, and digitalization. Previously, Ms. Humpton spent 2015 to 2018 as President and Chief Executive Officer of Siemens Government Technologies, Inc. ("SGT") and spent 2011 to 2015 as Senior Vice President and Chief Operating Officer of SGT. Prior to joining Siemens in 2011, she served as a Vice President at Booz Allen Hamilton where she was responsible for program performance and new business development for technology consulting in the U.S. Department of Justice and U.S. Department of Homeland Security. She also previously served as Vice President at Lockheed Martin Corporation from 2008 to 2010, where she was responsible for biometrics programs, border and transportation security, and critical infrastructure protection.

Ms. Humpton has sat on the board of directors of Triumph Group, Inc. (NYSE: TGI) since September 2019 and has sat on MARA Digital Holdings Inc.

(NASDAQ: MARA) since September 2024. Ms. Humpton also currently sits on the boards of Siemens Corporation, the Center for Strategic and Budgetary Assessments, Economic Club of Washington, DC, Chief Executives for Corporate Purpose, and the Federal Reserve Bank of Richmond.

**Key Attributes, Skills, and Qualifications:**

Ms. Humpton holds a Bachelor of Science degree in Mathematics from Wake Forest University.

We believe Ms. Humpton is qualified to serve on our Board of Directors due to her experience leading and managing large and complex businesses and her expertise in the energy industry, including innovative product, technologies, and services programs.

### Defendant Meier

42.    Defendant Meier has served as a Company director since January 2020. He also serves as a member of the Nominating and Corporate Governance Committee and the Finance and Investment Committee. In addition, since April 2019, Defendant Meier has served as Chief Financial Officer of Siemens Smart Infrastructure.

43.    The 2025 Proxy Statement stated the following about Defendant Meier:

**Professional Experience**:
Mr. Meier is a member of our Board and had served as a member of the board of directors of Fluence Energy, LLC since January 2020. Since April 2019, Mr. Meier has served as Chief Financial Officer of Siemens Smart Infrastructure. From 2015 until starting his current role, Mr. Meier was the Chief Financial Officer of Siemens Building Technologies. He started his career at Siemens in 1988 with increasing responsibilities in businesses pertaining to communications, industry, and infrastructure.

He currently sits on the board of directors of Siemens Government Technologies, Inc.

**Key Attributes, Skills, and Qualifications:**

Mr. Meier graduated from the University of Siegen in Germany with a degree in Financial Business Management.

We believe Mr. Meier is qualified to serve on our Board of Directors due to his financial acumen, extensive international experience creating value for businesses

and shareholders, and his experience with productivity and portfolio management and development.

**Defendant Mendoza**

44.    Defendant Mendoza has served as a Company director since August 2022. She also serves as a member of the Compensation and Human Resources Committee and the Nominating and Corporate Governance Committee. In addition, she has served as Executive Vice President and Chief Human Resources Officer at AES since February 2021.

45.    The 2025 Proxy Statement stated the following about Defendant Mendoza:

**Professional Experience:**

Ms. Mendoza has served as a member of our Board since August 2022. She has served as Executive Vice President and Chief Human Resources Officer at AES since February 2021. Prior to assuming her current position, Ms. Mendoza was Senior Vice President, Global Human Resources and Internal Communications and Chief Human Resources Officer at AES from 2015 to 2021, Vice President of Human Resources, Global Utilities from 2011 to 2012, and Vice President of Global Compensation, Benefits and HRIS, including Executive Compensation, from 2008 to 2011, and acted in the same capacity as the director of the function from 2006 to 2008. Prior to joining AES, Ms. Mendoza was Vice President of Human Resources for a product company in the Treasury Services division of JP Morgan Chase and Vice President of Human Resources and Compensation and Benefits at Vastera, Inc, a former technology and managed services company.

Ms. Mendoza currently sits on the board of IPALCO Enterprises, Inc. and The Dayton Power & Light Company.

**Key Attributes, Skills, and Qualifications:**

Ms. Mendoza studied management, leadership, organizational development and human resources through programs at Villanova University, Strayer University, University of Maryland University College and University of Virginia's Darden School of Business. She has earned various certificates in business management and leadership and a Bachelor's degree in Business Administration and Human Resources.

We believe that Ms. Mendoza is qualified to sit on our Board due to her track record of holistic transformations on companies' cultures, communication strategies, and talent development programs.

**Defendant Shelton**

46.    Defendant Shelton has served as a Company director since January 2018. Defendant Shelton also currently serves as Senior Vice President and Chief Product Officer of AES and President of AES Next, the strategic venture arm of AES.

47.    The 2025 Proxy Statement stated the following about Defendant Shelton:

**Professional Experience:**

Mr. Shelton is a member of our Board and had served as a member of the board of directors of Fluence Energy, LLC since January 2018. Mr. Shelton currently serves as Senior Vice President and Chief Product Officer of AES and President of AES Next, the strategic venture arm of AES. He began his tenure at AES in 1994, previously serving as President of AES Energy Storage, Vice President of New Energy Solutions, and as Chief Technology Innovation Officer.

Mr. Shelton currently serves on the board of directors of Uplight, Inc., a privately held software-as-service customer platform for utilities, AES Next Operations, LLC, AES Next Solar, LLC, AES Next, LLC, 5B Holdings Pty Ltd., AES Energy Storage, LLC, AES Next AI, LLC and AES Next AI Development, LLC. Mr. Shelton served as Chairman of the Board of the Electricity Storage Association from 2011 to 2013.

**Key Attributes, Skills, and Qualifications:**

Mr. Shelton is listed as an inventor on numerous patents, some of which are grid energy storage related. Mr. Shelton holds a B.S. from Indiana University of Pennsylvania and executive certificates in Strategy and Innovation from The Sloan School of Management at MIT and Organizational Leadership from The McDonough School of Business at Georgetown University.

We believe Mr. Shelton is qualified to serve on our Board of Directors due to his experience in inventing, commercializing, and scaling lithium-ion battery solutions for the electric grid and his broader experience in commercializing renewable energy and digital innovations.

**Defendant Smith**

48.    Defendant Smith has served as a Company director since June 2021. He also serves as the Chair of the Finance and Investment Committee. In addition, Defendant Smith has worked for Qatar Holding LLC, a Qatar Financial Centre entity ("QIA"), the Sovereign Wealth Fund of

Qatar, since 2012 as an Industrials Director covering a global portfolio of public and private investments. QIA holds 11.3% of the Company's Class A common stock and 3.8% of the Company's combined voting power.

49.    The 2025 Proxy Statement stated the following about Defendant Smith:

**Professional Experience**:

Mr. Smith is a member of our Board and had served as a member of the board of directors of Fluence Energy, LLC since June 2021. Mr. Smith has worked for Qatar Investment Authority, the Sovereign Wealth Fund of Qatar, since 2012. He is an Industrials Director covering a global portfolio of public and private investments. Prior to joining Qatar Investment Authority, Mr. Smith worked in equity research, as the sector head of European Capital Goods at Credit Suisse, and at Citigroup covering the Capital Goods and Transportation sectors. He additionally worked for a number of investment firms in London at the beginning of his career.

Mr. Smith currently serves on the board of directors of Advanced Integration Technology, a global provider of turnkey factory automation and aerospace tooling.

**Key Attributes, Skills, and Qualifications:**

Mr. Smith graduated from the University of Bristol with a BSc in Mathematics and has a Masters in Finance with distinction from London Business School.

We believe Mr. Smith is qualified to serve on our Board of Directors due to his experience investing in high growth companies across the spectrum of 'green' technology and his experience working with the management and boards of public and private companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.    By reason of their positions as officers, directors, and/or fiduciaries of Fluence and because of their ability to control the business and corporate affairs of Fluence, the Individual Defendants owed Fluence and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fluence in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fluence and its shareholders so as to benefit all

shareholders equally.

51.     Each director and officer of the Company owes to Fluence and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fluence, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Fluence were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fluence, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Fluence's Board at all relevant times.

55.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56.    To discharge their duties, the officers and directors of Fluence were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fluence were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to Fluence's own Code of Conduct & Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Fluence conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Fluence and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fluence's operations would comply with all applicable laws and Fluence's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.    Each of the Individual Defendants further owed to Fluence and the shareholders the duty of loyalty requiring that each favor Fluence's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Fluence and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, directorial, and controlling positions with Fluence, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fluence.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants who is a director of Fluence was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fluence and was at all times acting within the course and scope of such agency.

### FLUENCE'S CODE OF CONDUCT

66.     Fluence's Code of Conduct states that it "is a reflection of our Values" and further notes that "[t]o live up to our Values, we must have a company grounded in ethical and compliant practices. Our investors, customers, suppliers, communities and fellow colleagues rightfully expect it from us, and we are right to expect the same principles from everyone with whom we do business."

67.     In a section titled "Compliance with the Law," the Code of Conduct states the following:

> We will follow all laws, regulations and policies that govern our work. In some cases, our Values strive for a higher standard than what laws and regulations require. Laws and regulations may differ depending on the country or state in which we work, our country of citizenship or the Fluence business entity for which we work. Because Fluence is a company based in the United States, some United States laws apply to Fluence business outside of the United States, for example United States anti-corruption laws and United States embargoes and sanctions against

certain countries. Fluence team members must understand what laws apply to our business activities and should consult with Fluence legal counsel when in doubt.

68.    In a section titled "Corporate Disclosure," the Code of Conduct states the following:

The information in our public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable. To ensure Fluence meets this standard, the employees, directors and officers of Fluence who are involved with financial reporting, SEC filings, investor relations and public communications are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to Fluence, commensurate with their duties. These persons are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about us to others, including our independent auditors, governmental regulators and self-regulatory organizations. In addition, it is our policy to disclose material information concerning Fluence to the public only through specific limited channels to avoid inappropriate publicity and to ensure that all those with an interest in the Company will have equal access to information. Please refer to Fluence's "Corporate Disclosure Policy."

69.    In a section titled "Insider Trading," the Code of Conduct states the following:

Trading on inside information is a violation of federal securities law. Fluence people in possession of material non-public information about Fluence or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. For additional information, please refer to Fluence's "Insider Trading Compliance Policy" which is available in DMS.

70.    In a section titled "Conflicts of Interest," the Code of Conduct states the following,

in relevant part:

A conflict of interest occurs when the private interests of a Fluence director, officer, employee or independent contractor interfere in any way, or even appear to interfere with the interests of Fluence as a company. A conflict of interest can arise if such person takes actions or has interests that may make it difficult for him/her to perform his/her company work objectively and effectively. Conflicts of interest also arise when such a person or a member of his or her family receives improper benefits as a result of such person's position in the Company. A conflict can take

the form of a business relationship with, or an interest in, a competitor or customer of Fluence, or participation in sideline activities that prevent employees from being able to fulfill their responsibilities at Fluence.

71.    In a section titled "Corporate Opportunity," the Code of Conduct states the following:

> All employees, directors and officers of Fluence owe a duty to Fluence to advance the legitimate interests of Fluence when the opportunity to do so arises. Such persons are prohibited from directly or indirectly (a) taking personally for themselves opportunities that are discovered through the use of Fluence property, information or positions; (b) using Fluence property, information or positions for personal gain; or (c) competing with Fluence for business opportunities, unless otherwise approved by the disinterested members of the Board of Directors. It is important that all employees recognize and avoid conflicts of interest, or even the appearance of a conflict of interest, as they conduct their professional activities. We will avoid such situations. Our business decisions will be governed by judgment, objectivity, and loyalty toward Fluence and our stakeholders, not by our personal interests.

72.    In a section titled "Accurate Corporate Records," the Code of Conduct states the following:

> We require honest and accurate recording and reporting of information in order to make responsible business decisions. We document and record our business expenses accurately. We will create truthful and complete business records that have adequate supporting detail. We will not engage in manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practices. All of our books, records, accounts, and financial statements are CONFIDENTIAL AND PERSONAL INFORMATION maintained in reasonable detail, appropriately reflect our transactions, and conform both to applicable legal requirements and to our system of internal controls. It is strictly forbidden to mischaracterize any transaction, to use, authorize or condone any "off book" accounting or unrecorded bank accounts or any other device that could be utilized to distort the Company's true operating results and financial condition. This requirement extends beyond financial and accounting data and information regarding transactions, and extends to documentation of business travel and entertainment expenses or other payments made on behalf of Fluence. We will properly label and handle confidential, sensitive and proprietary information and will maintain documents, including electronic records in accordance with Fluence policies and any instructions from Fluence legal counsel regarding retention of documents.

73.    In a section titled "We Protect Company Assets," the Code of Conduct states the

following, in relevant part:

> We will protect Fluence assets, including physical equipment, funds, property, supplies, or other items of value. Theft or destruction of Fluence assets is prohibited. Business ideas are among Fluence's most valuable assets. Intellectual property, such as customer or supplier lists, provides Fluence with a competitive advantage and we will protect such intellectual property against loss, theft or other misuse. It is Fluence's policy that all intellectual property rights in work performed or created by Fluence employees and contractors in the course of their service for Fluence belong to Fluence. All employees and contractors will be required to sign appropriate notices and assignments of intellectual property to Fluence from time to time, in Fluence's discretion.

74.     Regarding waivers, the Code of Conduct states the following:

> The concepts set forth in this Code will be applied based on the particular circumstances presented; however, a waiver of any standard or requirement in this Code for directors, executive officers, or senior financial officers may be granted only by the Board of Directors, following approval by the Audit Committee. Such waivers will be disclosed to the public as required by applicable law or stock exchange listing standards.

75.     In violation of the Code of Conduct, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

76.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Fluence Energy, Inc. (the "Company") is to, among other things, oversee and monitor the quality, reliability and integrity of the accounting and

27

financial reporting processes of the Company and the audits of the financial statements of the Company and to oversee the Company's compliance with legal, contractual and regulatory requirements. The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements. Each member of the Committee is entitled to rely on the integrity of those persons within the Company and the professionals and experts from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

77.     Regarding the Audit Committee's duties with respect to "Annual Financial Statements and Annual Audit," the Audit Committee Charter states the following:

5. Audit Planning. The Committee will meet with the independent auditor prior to the audit to review the planning and staffing of the audit, and to discuss with the independent auditor the scope of its examinations of the book and records of the Company and its subsidiaries and the matters required to be discussed by the Statement of Auditing Standards No. 61, as amended, relating to the conduct of the audit.

6. Audit Issues. The Committee will discuss with the independent auditor any audit issues or difficulties and assess the adequacy of management's response.

7. Form 10-K Review. The Committee will review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and shall make a recommendation to the Board as to whether the annual audited statement should be included in the 10-K.

8. Audit Committee Report. The Committee will provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

78.     Regarding the Audit Committee's duties with respect to "Quarterly Financial Statements and Annual Audit," the Audit Committee Charter states the following:

9. Form 10-Q Review. The Committee will review, discuss and approve the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

79.    With respect to the Audit Committee's oversight responsibilities, the Audit

Committee Charter states the following, in relevant part:

> 12. Internal Control Over Financial Reporting; Disclosure Controls and Procedures.
> The Committee shall coordinate the Board's oversight of the Company's internal
> control over financial reporting and disclosure controls and procedures, including
> the area of taxation, including with respect to scope, design, adequacy and
> effectiveness. The Committee shall review, with management, the internal auditor
> and the independent auditor the integrity of the Company's financial reporting
> processes, both internal and external, and discuss: i. major issues regarding
> accounting principles and financial statement presentations, including any
> significant changes in the Company's selection or application of accounting
> principles; ii. analyses or other written communication prepared by management
> and/or the independent auditor setting forth significant financial reporting issues
> and judgments made in connection with the preparation of the financial statements,
> including analysis of the effect of alternative GAAP methods on the financial
> statements, and the ramifications of the use of such alternative methods; iii. other
> material written communications between the independent auditor and
> management, including, but not limited to, the management letter and schedule of
> unadjusted differences; iv. the critical accounting policies and practices of the
> Company; v. the effect of regulatory and accounting initiatives, as well as off-
> balance sheet transactions, arrangements, obligations and structure, on the financial
> statements of the Company; and vi. the type and presentation of information
> included in earnings press releases (paying particular attention to any use of "pro
> forma" or "adjusted" non-GAAP information), as well as review of any financial
> information and earnings guidance provided to analysts and rating agencies (paying
> particular attention to the use of non-GAAP financial information). The Committee
> shall engage the independent auditor to provide attestation services related to
> internal control over financial reporting. The Committee shall review the
> independent auditor's report on internal control. The Committee shall review with
> management the scope, and results of testing, including the mitigation of material
> weaknesses and significant deficiencies identified by the independent auditor.
>
> 13. Risk Assessment and Risk Management. The Committee will review and
> discuss the effectiveness of the Company's policies with respect to risk assessment
> and risk management, including guidelines and policies to govern the process by
> which the Company's exposure to risk is handled, and oversee management of the
> Company's financial risks and such other material risks, including but not limited
> to computerized information systems, facing the Company, including
> management's responses to findings and recommendations.

80.    In violation of the Audit Committee Charter, the Individual Defendants conducted

little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to

issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

81.     Fluence, through its subsidiaries, purports to be "a global market leader delivering intelligent energy storage and optimization software for renewables and storage."[2] The Company's products and services include energy storage products and solutions, digital applications, delivery services, recurring operational and maintenance services, and services for other power assets. The Company also maintains relationships with third-party manufacturers for the production and integration of its proprietary battery energy storage systems, Cubes.

82.     The Company was formed in 2021, and it conducts its business operations through Fluence Energy, LLC and both its direct and indirect subsidiaries. Fluence Energy, LLC, was created as a joint venture between indirect subsidiaries of Siemens and AES, Siemens Industry and AES Grid Stability, respectively.

83.     Per the Company's annual report for the fiscal year 2024, AES Grid Stability's holdings in Fluence amounted to approximately 66.6% of the Company's voting power. Siemens Industry's holdings amounted to 13.3% of the Company's voting power. Notably, slightly over

---

[2] Fluence Energy Inc., Annual Report (Form 10-K) (Nov. 29, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001868941/000186894124000070/flnc-20240930.htm.

forty percent of the Company's revenue derived from related parties, and the primary related party for the purposes of revenue was AES Grid Stability.

**FALSE AND MISLEADING STATEMENTS**

*November 29, 2023 Earnings Call*

84.    The Relevant Period began on November 29, 2023 when Fluence hosted an earnings call to discuss the Company's reported financial results for the fiscal 2023 fourth quarter. During the call, Defendant Nebreda stated:

> I want to emphasize the key takeaway from this quarter results. Firstly, we had a robust financial performance contributing to a record breaking annual revenue. Attaining profitability for the first time is a significant milestone, and we aim to capitalize on this achievement in fiscal '24. Second, ***we proactively secure our future by solidifying our battery supply for fiscal year '24 and '25, thus ensuring our ability to meet our growing demand.*** Finally, the introduction of our new $400 million ABL facility, provides us an additional tool to continue capturing the robust growth of the utilities cut.

85.    Later on the November 29th call, Defendant Nebreda boasted of the Company's sales deriving from iron ore. In relevant part, he stated:

> As you may recall, a year ago, we embarked on the transformation of our business. ***I'm pleased to report that we delivered on our commitments to the market. We grew our iron ore revenue by 85% and achieved our first profitable quarter . . . I'm pleased to report that we have secured all our battery needs for fiscal '24 and '25.***

*November 29, 2023 Form 10-K*

86.    Also on November 29, 2023, Fluence filed its annual report on Form 10-K with the SEC for 2023 (the "2023 10-K"), which was signed by Defendants Nebreda, Bulls, Mendoza, Humpton, Falck, Meier, Shelton, Smith, Fessenden, Arnold, Falu, and von Heynitz and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Defendant Nebreda attesting to its accuracy . In the 2023 10-K, Defendants Fluence and Nebreda reported the following:

31

As of September 30, 2023, the material weakness in internal control over revenue recognition has not fully been remediated. ***The Company's controls related to its estimate at completion ("EAC"), which is used in the Company's percentage of completion ("POC") accounting for its battery energy storage solutions were not effective.***

87.    The statements in ¶¶84-86 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

88.    On January 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

89.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board; (2) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for 2024; and (3) approve, on an advisory, non-binding basis, the compensation of the Company's named executive

officers.

90.     With respect to the Code of Conduct, the 2024 Proxy Statement stated the

following:

> We have adopted a Code of Conduct and Ethics (the "Code of Conduct") that
> applies to all of our directors, officers and employees, including our principal
> executive officer, principal financial officer, principal accounting officer or
> controller, or persons performing similar functions. Our Code of Conduct is
> available under the Governance section of the Investor Relations page of our
> website located at *www.ir.fluenceenergy.com*. In addition, we intend to post on our
> website all disclosures that are required by law or the Nasdaq rules concerning any
> amendments to, or waivers of, any provisions of our Code of Conduct.

91.     Regarding "Board Role in Risk Oversight," the 2024 Proxy Statement stated the

following:

> Risk assessment and oversight are an integral part of our governance and
> management processes. Our Board is responsible for overseeing our risk
> management process, while management is responsible for addressing the day-to-
> day risks facing our Company. Our Board focuses on our general risk management
> policies and strategy and the most significant risks facing the Company, and
> oversees the implementation of risk mitigation strategies by management.
> Management apprises our Board of risk management matters when they arise in
> connection with other topics within the Board's oversight. A fundamental part of
> risk oversight is not only understanding the material risks a company faces and the
> steps management is taking to manage those risks, but also understanding what
> level of risk is appropriate for the Company. While the full Board has overall
> responsibility for risk oversight, it is supported in this function by its Audit
> Committee, Compensation and Human Resources Committee, Nominating and
> Corporate Governance Committee, and Finance and Investment Committee.
>
> The Audit Committee is specifically tasked with overseeing the Company's
> policies with respect to risk assessment and risk management, including guidelines
> and policies to govern the process by which our exposure to risk is handled. In
> doing so, the Audit Committee oversees the Company's enterprise risk management
> program, which identifies and monitors those primary risks to the Company's
> business and management and select employees, including members of internal
> audit, will provide the Audit Committee with interim updates of such identified
> risks. The Company's Internal Audit team assists management in identifying,
> evaluating and implementing risk management controls and methodologies to
> address identified risks. At each of its quarterly meetings, the Audit Committee
> meets privately with representatives from the Company's independent registered
> public accounting firm, the head of Internal Audit and may meet with the
> Company's General Counsel. The Company's Chief Compliance Officer also

regularly updates the Audit Committee privately on the Company's compliance and ethics programs and any other compliance matter or concern. The Audit Committee provides reports to the Board which describe the current state of risk assessment and risk management of the Company. In addition to the above, our Audit Committee directly oversees the management of financial risks and cybersecurity risks pursuant to the terms of the Audit Committee Charter.

In addition, our Board and each of its committees, has an active role in overseeing management of the Company's risks. Our Board regularly reviews information regarding our strategy and operations, as well as the risks associated with each. Our Compensation and Human Resources Committee is responsible for overseeing the management of risks relating to the Company's compensation plans and arrangements, leadership succession planning, and the attraction and retention of key talent. See "Compensation Discussion and Analysis - Determination of Executive Compensation - Compensation Risk Assessment." Our Nominating and Corporate Governance Committee manages risks associated with the independence of the Board and potential conflicts of interest. Our Finance and Investment Committee helps to manage risks associated with our credit, liquidity, and financing activities and plans as well as tax strategies and potential strategic transactions and opportunities. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. In addition, our Board receives periodic detailed operating performance reviews from management.

92.    Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

93.    The 2024 Proxy Statement also failed to disclose that: (1) though the Company

claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

94.    As a result of Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for 2024; and (3) approve, on an advisory, non-binding basis, the compensation of the Company's named executive officers.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

95.    The truth began to emerge on February 22, 2024 when Blue Orca Capital reported that Siemens Energy filed a lawsuit in November 2023 against the Company, and that both Siemens and AES were divesting their interest in the Company. Notably, Blue Orca Capital revealed:

> Siemens and AES have together been Fluence's largest customers, together representing almost 90% of revenue as of Q1 FY22 and over 40% as of Q2 FY23. Siemens has since pulled away. We believe that AES, now Fluence's single largest customer by far, is also poised to hammer Fluence on pricing or take its business elsewhere. According to an interview with a former Fluence employee, AES is increasingly frustrated with its contract, under which it must purchase BESS systems exclusively from Fluence and pay the same prices as other smaller customers. Frustrated with this framework, AES is apparently eager to use its considerable leverage to negotiate better pricing. AES will soon have its chance. We uncovered the AES purchase agreement buried deep within the exhibits to

Fluence's filings, which shows that the strict exclusivity and pricing terms set forth in AES's purchase agreement are set to terminate once AES's voting power over Fluence drops below a looming threshold. AES started selling Fluence shares in December. Once AES sells down its stake a further 31%, it will be free to demand better pricing commensurate with its size and negotiating leverage, or else take its business elsewhere. If it divests its stake further, the non-compete terminates and AES can even develop competing solutions. With AES already in the process of selling its shares, we believe that it is only a matter of time before AES has neither a contractual requirement nor a financial incentive to purchase battery storage systems from Fluence at its current generous prices, if at all. With its largest customer on the precipice of hammering Fluence on pricing, we think this will slash Fluence's revenues and gut its already shaky financials.

96.     Likewise, with regards to Simens Energy, Blue Orca Capital reported that:

State court filings obtained via courier reveal that, undisclosed to investors, Siemens Energy, the US affiliate of Siemens, Fluence's corporate parent and largest shareholder, has filed a lawsuit accusing Fluence of misrepresentations, breach of contract and fraud. Filed as a counterclaim against Fluence in connection with the Antioch, California project, Siemens Energy alleges a laundry list of embarrassing and costly engineering and design failures as well as knowingly false representations and omissions. The suit is ongoing. In our view, this is the beginning of financial disaster for Fluence, which continues to be hopelessly dependent upon its corporate parents Siemens and AES for sales, financing, and basic corporate functions. We think this lawsuit explains why Siemens has ceased to be major customer, dramatically cutting its once sizable purchases from Fluence to just $11 million in FY23. We also suspect that this lawsuit may explain Siemens's decision to start selling down its 33% ownership stake in Fluence in December 2023, which began only a few days after the allegations were filed in court. This lawsuit, notably the accusations of false representations and fraud, appear to be setting in motion a tidal wave of dilution and selling pressure on Fluence's stock as its major corporate parents sell down their respective stakes. We think that without Siemens, Fluence, will crumble under the weight of its chronic unprofitability and historical cash burn. Ultimately, it is simply stunning that the U.S. energy affiliate of Fluence's largest shareholder has sued the Company, and that Fluence has not disclosed this bombshell to investors.

97.     The Blue Orca Capital also noted that the Company's revenue data was unreliable because a large portion of Fluence's expansion was purportedly due to "aggressive revenue pull-forwards" and "selectively applied earnings adjustments." In relevant part, Blue Orca Capital reported:

In the past several quarters, Fluence appears to have moved closer to generating positive earnings, sending its stock price soaring. But we believe that much of Fluence's sales and earnings growth can be attributed to aggressive revenue pull forwards and selectively applied earnings adjustments. We estimate that the Company inflated its LTM sales growth rate from 58% to over 80% in Q1 FY23 simply by rewriting of customer contracts that allowed it to recognize revenue on customers in advance of product installation. We view this as pure gimmickry, an accounting change on paper that juiced reported revenue growth without improving the business in any material way. In addition, we believe that an assortment convenient and selective earnings adjustments inflated its incremental Adj. EBITDA by 40% in FY23, and its Adj. Gross Margin from 3.9% to 6.6%. We believe that Fluence, through a series of one off accounting machinations, has exaggerated its gross margins, revenue growth and earnings growth. These aggressive accounting maneuvers appear to have been undertaken before and during the time that its major shareholders, who appear to wield influence over Fluence's financial reporting by supplying treasury services, began to sell down their respective stakes. But we suspect that these one-time financial gimmicks will come undone as they sell out.

98.     On this news, the price of the Company's stock fell $2.28 per share, or approximately 13%, from a closing price of $17.01 per share on February 21, 2024, to close at $14.73 per share on February 22, 2024.

99.     Nevertheless, Defendants continued to mislead investors, criticizing the Blue Orca Capital report by stating that it "wrongly implies AES is moving away from Fluence as a supplier when "[i]n fact, Fluence continues to be AES' preferred Battery Energy Storage Systems technology provider. Our robust pipeline of sales to other customers continues to grow." Defendants further stated "[w]e believe the litigation with Siemens Energy has no effect on our strong relationship with Siemens AG."

### *May 9, 2024 Earnings Call*

100.     On May 9, 2024, the Company hosted an earnings call to discuss the Company's reported financial results for the fiscal 2024 second quarter. With regard to the Company's revenue recognition practices, Defendant Nebreda stated the following, in relevant part:

So first, I think let's talk revenue recognition because I think it's important to get

37

to know. So what are we -- what do we have? ***We have -- the way we work, the way our revenue recognition formula works, there's some recognition at the beginning when we signed the contract to the engineer and ordered the equipment, then there is a significant -- and this is a bulk of our revenue recognition is when we transfer title of the equipment to the customer and then additional revenue recognition at substantial completion and final completion.***

* * *

So this year is a lot back ended. Last year was very, very divided equally around each quarter, the year before the -- it was in the center where most of the center of our fiscal year or most of the revenue was. So it moves around, and it moves around because it is driven by our customer projects time, which, in a way, also is driven by what they signed with their own PPA.

***So going back, this is mostly driven by delivery or transferring title of manufactured cubes to our customers, limited number of projects, 20 to 25, not -- we are not talking here huge amounts. We've been very, very good at doing this.*** So we had very, very good KPIs in the close to 100% in terms of delivery capability. So we believe -- so unless there is the global disruption that stops the world trade, we should be able to do this.

101.    Also during the May 9th earnings call, Defendant Pasha explained:

[O]ur revenue is recognized as we hit certain milestones. For example, ***the majority of our Q4 project milestones are for production and delivery of cubes, which is within our control. To that end, we have secured the necessary batteries, manufacturing slots and logistics. These factors provide us confidence in our ability to deliver on our revenue targets.***

***August 8, 2024 Earnings Call***

102.    On August 8, 2024, the Company hosted an earnings call to discuss the Company's reported financial results for the fiscal 2024 third quarter. Defendant Nebreda made a number of statements during the call, namely that the Company possessed "strong growth prospects," and that the Company's "pipeline is a rolling 24-month view, thus giving us confidence in our ability to continue our growth trajectory. Our $20 million pipeline has increased 65% from this time last year, which reflects rapid growth prospect for any storage globally." Defendant Nebreda went on to state: ***"The strength of our pipeline is a key reason for our high confidence in our expected revenue growth. We are reaffirming our fiscal year '25 revenue outlook of 35% to 40% growth***

*of our original fiscal '24 revenue guidance at midpoint of $3 billion."*

103.    Also during the August 8th earnings call, Defendant Pasha likewise stated: "looking ahead to fiscal '25, *we continue to expect strong growth, as Julian discussed, using our original fiscal '24 revenue guidance midpoint of $3 billion as a base we reaffirm our expected fiscal '25 revenue growth of 35% to 40%.*" Defendant Pasha also criticized the February 2024 Blue Orca report, stating "I am pleased to share that [the] investigation concluded that the allegations contained in the short report are without merit." She also stated the following, in relevant part:

> As you may know, a short seller report was published on us back in February of this year. In response to the allegations made in the short report, our Board's Audit Committee conducted an investigation with the assistance of an outside counsel and forensic accountants.
>
> *I am pleased to share that this investigation concluded that the allegations contained in the short report are without merit.* Recently, however, the SEC notified us that they are investigating certain matters pertaining to the company. Based on the information the SEC has requested, we believe we are examining some of the topics raised in the short seller's report, such as revenue recognition policies and our previously disclosed material weakness. We are fully cooperating with the SEC.
>
> Although we cannot predict the timing or the outcome based on the nature of these matters and information requested by the SEC we do not expect it to have a material impact on our financial condition.

***November 26, 2024 Earnings Call***

104.    On November 26, 2024, Fluence hosted an earnings call to discuss the Company's reported financial results for the fiscal 2024 fourth quarter. During the call, with respect to the Company's revenue guidance, Defendant Pasha stated:

> We are initiating revenue guidance for fiscal '25 with a midpoint of $4 billion. ***This is in line with our prior expectations and represents 50% growth from fiscal '24. We feel confident about our ability to achieve this target, which is primarily driven by 3 factors.***
>
> ***First, approximately 2/3 of our 2025 revenue is currently in our backlog, consistent with where we were at this point last year. Second, we are in advanced***

*and exclusive negotiations on a number of projects totaling $1.5 billion in value; and third, we have an increasing number of opportunities illustrated by our growing pipeline of projects across the world*, as Julian mentioned.

For fiscal '25, we expect an adjusted gross profit margin of between 10% and 15%. As a result, we expect to deliver an adjusted EBITDA midpoint of $180 million. And for ARR, we continue to see traction in our platform and expect to end the fiscal year with $145 million of ARR.

*Additionally, from a timing perspective and consistent with last year, we expect fiscal '25 revenue to be back-end loaded, with approximately 20% of annual revenue in first half and the remaining 80% in the second half of fiscal year.*

105.    Also during the November 26th earnings call, Defendant Pasha responded to a question about Fluence's revenue guidance by stating:

So as we said, we have roughly 2/3 of our revenue -- midpoint guidance in our backlog already. And we are roughly -- we had around $1.5 billion in contracts that were in late stages of negotiations or we are selected by the customer for the contract. *That roughly -- that $1.5 billion, more than half will be revenue that will be covered in -- that will convert into revenue into '25. So we feel very confident of our midpoint guidance range.* We have some wood to chop. There's some more contracts that we need to sign, but we feel very good with where we are today.

In terms of our backlog, as you know, we make -- we take a very, very strict view of our backlog situation, and we really look -- in order to have things considering to our backlog, there need to be things that are signed and that there is -- that we believe we can -- that there is a real commitment from our customers to take those projects on time and deliver.

*So they're binding deals. So we feel very confident that we have seen very little to none -- we have seen delays, as you know, we have talked last year, but we have not seen real cancellations of projects on the backlog once we signed it, essentially because we take a very, very strict view.*

As I always said, there are contracts we have signed that are still subject to certain conditions that are in pipeline. They're not in backlog because they are not at the stage where they can be considered at that point. *So we feel very confident about the 66% coverage in our backlog. The contracts were in late stage of negotiation or we've been selected that will represent around $1.5 billion of backlog, but around $800 million of revenue for the year -- for '25.* And then a small portion we need took over, we believe we will be able to cover from now to March of next year.

*November 29, 2024 Annual Report (Form 10-K)*

106.    On November 29, 2024, the Company filed its annual report on Form 10-K with the SEC for 2024 (the "2024 10-K"), which was signed by Defendants Nebreda, Pasha, Bulls, Mendoza, Humpton, Falck, Meier, Shelton, Smith, Fessenden, Arnold, Falu, and von Heynitz and contained SOX certifications signed by Defendants Nebreda and Pasha attesting to its accuracy. Within the report, Defendants stated:

> As of September 30, 2024, we determined that a material weakness in the internal control over revenue recognition exists. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. ***The Company did not consistently apply controls in its revenue recognition process related to the evaluation of contract terms for purposes of determining their impact on when costs are included in the measure of progress.***

107.    The statements in ¶¶99-106 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2025 Proxy Statement

108.    On January 24, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith solicited the 2025 Proxy Statement, which was filed pursuant to

41

Section 14(a) of the Exchange Act and contained material misstatements and omissions.

109.    The 2025 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Arnold, Bulls, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board; (2) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for 2025; and (3) approve, on an advisory, non-binding basis, the compensation of the Company's named executive officers.

110.    With respect to the Code of Conduct, the 2025 Proxy Statement stated the following:

> We have adopted a Code of Conduct and Ethics (the "Code of Conduct") that applies to all of our directors, officers, and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. Our Code of Conduct is available under the Governance section of the Investor Relations page of our website located at *www.ir.fluenceenergy.com*. In addition, we intend to post on our website all disclosures that are required by law or the Nasdaq rules concerning any amendments to, or waivers of, any provisions of our Code of Conduct.

111.    Regarding "Board Role in Risk Oversight," the 2025 Proxy Statement stated the following:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board is responsible for overseeing our risk management process, while management is responsible for addressing the day-to-day risks facing the Company. Our Board focuses on our general risk management policies and strategy and the most significant risks facing the Company, and oversees the implementation of risk mitigation strategies by management. Management apprises our Board of risk management matters when they arise in connection with other topics within the Board's oversight. A fundamental part of risk oversight is not only understanding the material risks a company faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for the Company. While the full Board has overall responsibility for risk oversight, it is supported in this function by its Audit Committee, Compensation and Human Resources Committee, Nominating and Corporate Governance Committee, and Finance and Investment Committee.
>
> Our Compensation and Human Resources Committee is responsible for overseeing the management of risks relating to the Company's compensation plans and arrangements, leadership succession planning, and the attraction and retention of

key talent. See "Compensation Discussion and Analysis - Determination of Executive Compensation - Compensation Risk Assessment." Our Nominating and Corporate Governance Committee manages risks associated with the independence of the Board and potential conflicts of interest, as well as having primary oversight of ESG matters and related risks. Our Finance and Investment Committee assists the Board to manage risks associated with our credit, liquidity, and financing activities and plans as well as tax strategies and potential strategic transactions and opportunities. The Audit Committee is specifically tasked with overseeing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which our exposure to risk is handled. The Company's Internal Audit team assists management in identifying, evaluating and implementing risk management controls and methodologies to address identified risks. At each of its quarterly meetings, the Audit Committee meets privately with representatives from the Company's independent registered public accounting firm and the head of Internal Audit. In addition to the above, our Audit Committee directly oversees the management of financial risks and cybersecurity risks and management's implementation of our cybersecurity risk management program. The Company's Chief Legal and Compliance Officer and members of his team also regularly update the Audit Committee privately on the Company's compliance and ethics programs and other compliance matters or concerns.

The full Board is regularly informed through committee reports about such risks, as appropriate. In addition, our Board receives periodic detailed operating performance reviews from management, who discuss the risks and exposures involved in their respective areas of responsibility as well as any developments that could impact our risk profile or other aspects of our business. These reports from management are designed to provide timely visibility to the Board and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

112.    Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins

were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

113.    The 2025 Proxy Statement also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

114.    As a result of Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Arnold, Bulls, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for 2025; and (3) approve, on an advisory, non-binding basis, the compensation of the Company's named executive officers.

## THE TRUTH FULLY EMERGES

115.    The truth fully emerged on February 10, 2025 when the Company issued a press release concerning its financial results for the first quarter of its fiscal year 2025. The Company's press release announced a net loss of $57 million or $0.32 per share, compared to the previous year's loss of $25.6 million or $0.14 per share for the same period, and a decline of 49% for year-over-year revenue, to $186.8 million. The Company also revised its revenue guidance for 2025,

lowering the range from $3.6 billion-$4.4 billion to $3.1 billion to $3.7 billion.

116.    On this news, the price of the Company's stock fell $6.07 per share, or approximately 46.44%, from a closing price of $13.07 per share on February 10, 2025 to close at $7.00 per share on February 11, 2025.

## DAMAGES TO FLUENCE

117.    As a direct and proximate result of the Individual Defendants' conduct, Fluence will lose and expend many millions of dollars.

118.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

121.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

122.    As a direct and proximate result of the Individual Defendants' conduct, Fluence has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

45

that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

123.    Plaintiff brings this action derivatively and for the benefit of Fluence to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fluence, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

124.    Fluence is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.    Plaintiff is, and has been at all relevant times, a shareholder of Fluence. Plaintiff will adequately and fairly represent the interests of Fluence in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

126.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

127.    A pre-suit demand on the Board of Fluence is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Nebreda, Arnold, Bulls, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Shelton, and Smith (the "Director-Defendants") and non-party Peter Chi-Shun Luk (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time of the filing of this complaint.

128.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

129.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Fluence to issue false and misleading statements which were intended to make Fluence appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130.    Additional reasons that demand on Defendant Nebreda is futile follow. Defendant Nebreda has served as the Company's President and CEO since September 1, 2022 and as a Company director since September 2021. Defendant Nebreda also serves as a member of the Finance and Investment Committee. Prior to joining Fluence as President and CEO, Defendant Nebreda served as Executive Vice President and President of US & Global Business Lines for AES from January 2022 through August 2022. In addition, the Company provides Defendant Nebreda with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to

make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Nebreda also personally made several of the false and misleading statements alleged herein. In addition, he signed and made SOX certifications for the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Nebreda is named as a defendant in the Securities Class Action. For these reasons, Defendant Nebreda breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Arnold is futile follow. Defendant Arnold has served as a Company director since October 2021. Defendant Arnold also serves as a member of the Nominating and Corporate Governance Committee and the Audit Committee and as the Chairperson of the Compensation and Human Resources Committee. Defendant Arnold has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. In addition, she, through her attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. She also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these

reasons, Defendant Arnold breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Bulls is futile follow. Defendant Bulls has served as Chairperson of the Board since October 2021. He also serves as the Chairperson of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and the Finance and Investment Committee. Defendant Bulls has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he, through his attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Bulls breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Falu is futile follow. Defendant Falu has served as a Company director since September 2022. He also serves as a member of the Finance and Investment Committee. In addition, Defendant Falu has served as Executive Vice President, Chief Operating Officer and President, New Energy Technologies SBU at AES since February 2024 and previously was Senior Vice President, Chief Operating Officer and President of New Energy Technologies at AES from July 2023 to February 2024. Thus, as the Company admits, he is a non-independent director. Defendant Falu has received and continues to receive

handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he, through his attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Falu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Fessenden is futile follow. Defendant Fessenden has served as a Company director since October 2021. She also serves as a member of the Audit Committee and the Compensation and Human Resources Committee. Defendant Fessenden has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. In addition, she, through her attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. She also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Fessenden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and,

therefore, excused.

135.    Additional reasons that demand on Defendant von Heynitz is futile follow. Defendant von Heynitz has served as a Company director since October 2021. He also serves as Chairperson of the Audit Committee and as a member of the Compensation and Human Resources Committee and the Nominating and Corporate Governance Committee. Defendant von Heynitz has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he, through his attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant von Heynitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Humpton is futile follow. Defendant Humpton has served as a Company director since September 2021. She also serves as a member of the Compensation and Human Resources Committee. In addition, she has served as President and Chief Executive Officer of Siemens Corporation, the largest subsidiary of Siemens AG, since June 2018. Thus, as the Company admits, she is a non-independent director. Defendant Humpton has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. In addition, she, through her attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. She also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Humpton breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Meier is futile follow. Defendant Meier has served as a Company director since January 2020. He also serves as a member of the Nominating and Corporate Governance Committee and the Finance and Investment Committee. In addition, since April 2019, Defendant Meier has served as Chief Financial Officer of Siemens Smart Infrastructure. Thus, as the Company admits, he is a non-independent director. Defendant Meier has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he, through his attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Meier breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Mendoza is futile follow. Defendant Mendoza has served as a Company director since August 2022. She also serves as a member of the Compensation and Human Resources Committee and the Nominating and Corporate Governance Committee. In addition, she has served as Executive Vice President and Chief Human Resources Officer at AES since February 2021. Thus, as the Company admits, she is a non-independent director. Defendant Mendoza has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. In addition, she, through her attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. She also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Mendoza breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Shelton is futile follow. Defendant Shelton has served as a Company director since January 2018. Defendant Shelton also currently serves as Senior Vice President and Chief Product Officer of AES and President of AES Next, the strategic venture arm of AES. Thus, as the Company admits, he is a non-independent director. Defendant Shelton has received and continues to receive handsome compensation for his role as a

director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he, through his attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Shelton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since June 2021. He also serves as the Chair of the Finance and Investment Committee. In addition, Defendant Smith has worked for QIA, the Sovereign Wealth Fund of Qatar, since 2012 as an Industrials Director covering a global portfolio of public and private investments. Thus, as the Company admits, he is a non-independent director. Defendant Smith has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he, through his attorney-in-fact, signed the false and misleading 2023 and 2024 10-Ks. He also solicited the false and misleading 2024 and 2025 Proxy Statements, which resulted in shareholders voting, *inter alia*, to re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the

Company. For these reasons, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on the Board is futile follow.

142.    Defendants Arnold, Bulls, Fessenden, and von Heynitz (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

143.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets;

comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

144.    Fluence has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Fluence any part of the damages Fluence suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

145.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

146.    The acts complained of herein constitute violations of fiduciary duties owed by Fluence's officers and directors, and these acts are incapable of ratification.

147.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fluence. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Fluence, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

148.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Fluence to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

149.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

150.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

153.    Under the direction and watch of Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith , the 2024 and 2025 Proxy Statements failed to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

154.    The 2024 and 2025 Proxy Statements also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 and 2025 Proxy Statements' descriptions of the Board's and its

committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

155.    In the exercise of reasonable care, Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith  should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 and 2025 Proxy Statements including, but not limited to, the election of directors.

156.    As a result of Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for 2024; and (3) approve, on an advisory, non-binding basis, the compensation of the Company's named executive officers.

157.    As a result of Defendants Arnold, Bulls, Falck, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Arnold, Bulls, Falu, Fessenden, von Heynitz, Humpton, Meier, Mendoza, Nebreda, Shelton, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2)

ratify the appointment of EY as the Company's independent registered public accounting firm for 2025; and (3) approve, on an advisory, non-binding basis, the compensation of the Company's named executive officers.

158.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 and 2025 Proxy Statements.

159.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fluence's business and affairs.

162.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

163.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fluence.

164.    In breach of their fiduciary duties owed to Fluence, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's alliance with its largest sources of revenue and founders was positioned to decline; (2) Siemens Energy, the Company's largest shareholder's U.S. affiliate, filed a lawsuit in November 2023 against the Company, making claims against Fluence for engineering failures and fraud; (3) both Simens

Energy and AES Grid Stability, LLC were in the process of divesting or were likely to divest their holdings in Fluence; and (4) as Siemens and AES were moving to divest, the Company's revenue growth and margins were artificially inflated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

165.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

166.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

167.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fluence's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

168.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169.    As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Fluence has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fluence.

173.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Fluence that was tied to the performance or artificially inflated valuation of Fluence or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

174.    Plaintiff, as a shareholder and a representative of Fluence, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

175.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Abuse of Control**

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fluence, for which they are legally responsible.

178.    As a direct and proximate result of the Individual Defendants' abuse of control, Fluence has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Fluence has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fluence in a manner consistent with the operations of a publicly held corporation.

182.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fluence has sustained and will continue to sustain significant damages.

183.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

184.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

187.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fluence to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

188.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

189.    Plaintiff, on behalf of Fluence, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Nebreda and Pasha for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.    Fluence and Defendants Nebreda and Pasha are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Nebreda's and Pasha's willful and/or reckless violations of their obligations as officers and/or directors of Fluence.

192.    Defendants Nebreda and Pasha, because of their positions of control and authority

as officers and/or directors of Fluence, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Fluence, including the wrongful acts complained of herein and in the Securities Class Action.

193.    Accordingly, Defendants Nebreda and Pasha are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

194.    As such, Fluence is entitled to receive all appropriate contribution or indemnification from Defendants Nebreda and Pasha.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Fluence, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Fluence;

(c)    Determining and awarding to Fluence the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Fluence and the Individual Defendants to take all necessary actions to reform and improve Fluence's corporate governance and internal procedures to comply with applicable laws and to protect Fluence and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation

and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Fluence to nominate at least six candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Fluence restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 3, 2025

Respectfully submitted,

**SPIRO & BROWNE, PLC**

_/s/ David G. Browne_
David G. Browne (VSB No. 65306)
Spiro & Browne PLC
2400 Old Brick Road
Glen Allen, VA 23060
Telephone: (804) 573-9220
Email: dbrowne@sblawva.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net